# In The Matter Of:

*STATE FARM MUTUAL AUTO INS. CO.*
*v.*
*SLAVIK STEIN*

---

## *GUTGARTS, ELIOZAR – Vol. 1*
### *February 24, 2011*

---

**MERRILL CORPORATION**

LegaLink, Ino.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

ELIOZAR GUTGARTS - 2/24/2011

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


STATE FARM MUTUAL AUTO INS. )
CO., et al.,                 )
                             )
            Plaintiffs,      )
                             )
     VS.                     ) Case No. 2:10-cv-01332
                             )
SLAVIK STEIN, et al.,        )
                             )
            Defendants.      )
                             )


DEPOSITION OF ELIOZAR GUTGARTS

TAKEN ON

THURSDAY, FEBRUARY 24, 2011


Reported by:  MARLA GORLICK

             CSR No. 3767

ELIOZAR GUTGARTS - 2/24/2011

Page 2

1          Deposition of ELIOZAR GUTGARTS, taken on behalf of

2      the plaintiff, at 2029 Century Park East, 26th Floor,

3      Los Angeles, California 90067, on Thursday, February 24,

4      2011, at 2:09 p.m., before Marla Gorlick, CSR No. 3767,

5      pursuant to Notice.

6

7      APPEARANCES:

8

9      FOR THE PLAINTIFF:

10          FREEBORN & PETERS LLP
            BY:  NEAL H. LEVIN, ESQ.
11          311 South Wacker Drive
            Suite 3000
12          Chicago, Illinois  60606-6677
            (312) 360-6000
13

       FOR THE WITNESS and THIRD-PARTY RESPONDENTS:
14
            LAW OFFICE OF GERALD I. NEITER
15          BY:  GERALD I. NEITER, ESQ.
            1925 Century Park East
16          Suite 2000
            Los Angeles, California  90067
17          (310) 277-2236

18      ALSO PRESENT:

19          LYUDMILA GUTGARTS

20

21

22

23

24

25

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 3

1                          I N D E X

2

3    WITNESS                EXAMINATION              PAGE

4    ELIOZAR GUTGARTS       (By Mr. Levin)            4

5

6

7

8

9                          E X H I B I T S

10   NO.          PAGE     DESCRIPTION

11   Exhibit 1     24      Subpoena to Testify at a Deposition

12                         in a Civil Action

13

14

15

16

17   UNANSWERED QUESTIONS

18   Page 8, Line 10        Page 51, Line 20

19   Page 17, Line 22       Page 54, Line 19

20   Page 31, Line 7

21   Page 32, Line 8

22   Page 32, Line 21

23   Page 34, Line 17

24   Page 47, Line 3

25   Page 51, Line 15

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 4

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 24, 2011
 2                              2:09 P.M.
 3
 4
 5
 6                        ELIOZAR GUTGARTS,
 7              having been first duly sworn, was
 8              examined and testified as follows:
 9
10                           EXAMINATION
11   BY MR. LEVIN:
12        Q.   Okay.  State your name for the record, please.
13        A.   My name is Eliozar Gutgarts.
14        Q.   Spell it, please.
15        A.   E-l-i-o-z-a-r first name, and last name
16   Gutgarts, G-u-t-g-a-r-t-s.
17        Q.   And you are a medical doctor?
18        A.   No, I am dentist.
19        Q.   Dentist.  So Dr. Gutgarts would be an
20   appropriate salutation?  Yes?
21        A.   Yes.
22        Q.   Have you given a deposition before?
23        A.   One time in my life.  It was 25 years ago.  It
24   was --
25              MR. NEITER:  You answered the question.
```

ELIOZAR GUTGARTS - 2/24/2011

Page 5

1        THE WITNESS:  Yes.

2   BY MR. LEVIN:

3        Q.   Okay.  So it's been a long time so let me just

4   remind you of a few of the things that will go on today.

5   We call them the ground rules or housekeeping.

6            The person to your left is the court reporter.

7   She's going to take down everything that's spoken.

8   Accordingly, your answers all have to be spoken.  She

9   can't take down a nod of the head, a shrug of the

10  shoulder, anything like that.  She has to actually hear

11  you speak the answer.  Everyone has a tough time with

12  that one at first so I'm sure it will happen to you as

13  well.  Second, if you give an answer, and we discussed

14  this a little bit before the deposition before, I'll

15  assume you understood the question.  If you don't

16  understand the question, tell me and we'll try and work

17  it out.  But if you give an answer, I'll assume that you

18  actually understood the question.  Okay?

19       A.   Okay.

20       Q.   Like that, you need to make sure that you speak

21  that loud enough so that the court reporter can hear

22  you.  And there was another nod.  So say okay out loud.

23       A.   Okay.

24       Q.   Very good.  That's a practice run.  If you need

25  to take a break, refreshments, washroom, let me know.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 6

```
1          A.  I don't want a break.  I want to go home.
2          Q.  We'll go fast then.  I talk first which most
3    court reporters don't like.  But all I ask is that we
4    not take a break with a question pending so that you can
5    talk with your attorney.  Your attorney will make
6    certain objections.  Wait for him to make his
7    objection -- I'm certain he'd appreciate that -- and
8    then we'll decide whether or not you're going to give an
9    answer.
10         Any questions?
11         A.  No.
12         Q.  English is not your first language; is that
13   correct?
14         A.  Correct.
15         Q.  What is your first language?
16         A.  Russian.
17         Q.  And your second?
18         A.  Ukraine.
19         Q.  And how long have you been in the United
20   States?
21         A.  32 years.  I came here 1979.
22         Q.  If you could just speak up a little bit louder,
23   A, to make sure the court reporter hears it all and, B,
24   I'm a little hard of hearing.  So if you can speak
25   loudly, that will be helpful.
```

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 7

1          What is your current occupation?

2      A.  Where I live or working?

3      Q.  Occupation, not residence.  What do you do for

4  a living?

5      A.  For a living, I work in dentist and my

6  occupation is Hollywood, 77 -- 65778 --

7          MR. NEITER:  No.  You have to answer the

8  question.  Don't look to Mila for the answer.  If you

9  don't remember the address, you can say you don't

10 remember.

11         THE WITNESS:  I don't remember.  That's 75 --

12 758 -- no, seven -- I don't remember.

13 BY MR. LEVIN:

14     Q.  Let me try this:  7865 Santa Monica Boulevard?

15     A.  7865, right, Santa Monica Boulevard.

16     Q.  In Los Angeles?

17     A.  Los Angeles.

18     Q.  And that's your business address or home

19 address?

20     A.  No, that's business address.

21     Q.  What is your home address?

22     A.  7984 Oceanus Drive.

23     Q.  I don't know that we got all the numbers right.

24 What were the numbers?

25     A.  7984 Oceanus Drive.

ELIOZAR GUTGARTS - 2/24/2011

Page 8

1      Q.   Oceanus Drive.

2      A.   Oceanus.

3      Q.   And that's in what city?

4      A.   Los Angeles.

5      Q.   And how long have you lived there?

6      A.   I live 25 years.

7      Q.   And who do you live there with?  Who do you

8    live there with?

9      A.   With my wife.

10     Q.   And does anybody else live with you at that

11   address?

12          MR. NEITER:  Just a moment.  I'm going to

13   object to that question.  I understand some people may

14   think it's preliminary, but that invades my client's

15   right of privacy who he lives with.  I will instruct him

16   not to answer that question on the grounds of privacy.

17   BY MR. LEVIN:

18     Q.   Are you following your attorney's advice --

19     A.   Yes.

20     Q.   -- and refusing to answer the question?

21     A.   Yes.

22     Q.   Who is Stanley Stein?

23     A.   My wife younger brother.

24     Q.   Your wife's younger brother?

25     A.   Uh-huh.

Merrill   Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 9

1    Q.   Yes.   And he also goes by Slavik, I believe?

2    A.   Slavik.

3    Q.   First name Slavik?

4    A.   Slavik.

5    Q.   When was the first time that you met

6    Slavik Stein?

7    A.   59 years ago.

8    Q.   59 years ago?

9    A.   Uh-huh.

10   Q.   Yes?

11   A.   Yeah.   He was 10 years.

12   Q.   He was what?

13   A.   He was 10 years.

14   Q.   59 years ago he was 10 years old?

15   A.   Yeah, he not me.   I was 18.

16   Q.   So you have him at 69 years old right now.

17   A.   Well, my wife was 16, Slavik was 10, I was 18.

18   Q.   Okay.   Has Slavik ever lived with you?

19   A.   He was very good with me.

20       MR. NEITER:   No, no, no, that was not the

21   question.   I'm going to ask the reporter to read the

22   question, and I'm going to ask you to listen to the

23   question.

24       MR. LEVIN:   I could ask it again.

25       MR. NEITER:   Okay.

Merrill   Corporation   -   Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 10

1    BY MR. LEVIN:

2        Q.   Has Slavik ever lived with you?

3        A.   Live, no.

4        Q.   Do you know where he lives currently?

5        A.   Lives currently?

6        Q.   Where does he live now?

7        A.   Who?

8        Q.   Slavik.

9        A.   I don't know.

10       Q.   When was the last time you've seen him?

11       A.   Last time I see him maybe I see him couple days

12   every day Marina in hospital and after two or three

13   times.  Two or three times after Marina in hospital.

14   Maybe once a month.

15       Q.   Okay.  Let me try and isolate the dates a

16   little bit.  You said two or three times a week when

17   Marina was in the hospital?

18       A.   Uh-huh.  Not three times, every day.  Every day

19   because Marina was in very bad condition.

20       Q.   Marina, of course, is who?  Who is Marina?

21       A.   Marina my sister-in-law.  Marina young brother

22   wife.  Mila's young brother wife.  My wife Mila.

23       Q.   Okay.  It's Mila's younger brother's wife?

24       A.   Wife.

25       Q.   So Slavik's wife.

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 11

1    A.   Slavik's wife.

2    Q.   So you would see him in the hospital two or

3    three times a day during the time she was in the

4    hospital?

5    A.   No, three times, three times once a day at the

6    time of surgery.

7    Q.   Okay.  And when did she have the surgery?

8    A.   When?

9    Q.   Yes.

10   A.   Two months ago, three months ago.  More?

11   Q.   Well, again --

12   A.   I don't remember exactly.

13   Q.   Okay, fine.

14   A.   Couple of months ago.

15   Q.   I believe you also then said that you had seen

16   him maybe two or three times, but correct me if I'm

17   wrong, since the hospital; is that correct?  That you've

18   seen Slavik two or three times since the hospital?

19   A.   Yes.

20   Q.   So when was the last time that you have seen

21   him in the hospital?  In other words, when did Marina

22   leave the hospital?

23   A.   After surgery, after three-day after surgery.

24   Q.   Three days after surgery?

25   A.   Yes.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 12

1      Q.   So a few months ago?

2      A.   Few months ago.

3      Q.   We don't need to be too precise.   Just general

4  is fine.   So two or three months ago Marina left the

5  hospital, and you've seen Slavik a few times since then?

6      A.   Uh-huh, absolutely right.

7      Q.   Where did you see him those three times since

8  the hospital?

9      A.   What?

10     Q.   Where did you see him those three times that

11 you saw him since the hospital?

12     A.   I see him in Marina's room.

13     Q.   At the hospital?

14     A.   In hospital.

15     Q.   I'm talking about --

16     A.   In emergency room.

17     Q.   Okay.

18     A.   Not emergency.   This is -- special care unit.

19     Q.   Intensive care?

20     A.   Intensive care unit.   I'm sorry.

21     Q.   You say that you've seen Slavik since the

22 hospital; correct?

23     A.   Correct.

24     Q.   After Marina left the hospital, you've seen him

25 since then; correct?

Merrill   Corporation   -   Los Angeles
800-826-0277                      www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 13

1      A.   I see him after hospital maybe once a week

2   he come to my office say hi.  Where do you live?  In

3   Los Angeles?

4      Q.   Do I live in Los Angeles?  No, I don't.  I'm

5   from Chicago.

6      A.   From Chicago?

7      Q.   Yes.

8      A.   I work in Center Los Angeles, and he come to my

9   office like my other neighbor, relatives, once a week,

10  once two weeks, once a month, two times in two months,

11  once a month say hi.  Sometimes he has problem with his

12  teeth for cleaning.  I'm a dentist and he's my patient

13  50 years.

14     Q.   And so you say you see him then once a month?

15     A.   Once a month, once in two months.

16     Q.   And you say he comes by the office to say hi?

17  Yes?

18     A.   Yes.  Yes.

19     Q.   Has he ever worked at your office?

20     A.   Yeah, he work in my office maybe 20 years ago,

21  30 years ago.  I don't remember.  A long time ago.

22     Q.   So it's been about 20 or 30 years since he's

23  worked in your office?

24     A.   Uh-huh.

25     Q.   Yes?

Merrill   Corporation   -   Los Angeles
800-826-0277                        www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 14

1      A.   Yeah.   And he worked maybe one or two months 10

2   or 15 years.

3      Q.   I'm sorry?

4      A.   A couple of months he work in my office maybe

5   10 or 15 years ago.

6      Q.   And not since.   No?

7      A.   No.

8      Q.   Has he ever maintained an office or had an

9   office at your office where he wasn't working for you,

10  but just working out of your --

11         MR. NEITER:   Excuse me.   That was a compound

12  question and I don't know what it was that he was about

13  to say, but I think it would have been impossible for

14  him to answer that compounded question.   I'll ask you to

15  ask a single question.

16         MR. LEVIN:   That's fine.   I caught myself

17  trying to make it simpler as I was going along.

18         THE WITNESS:   Yeah, don't --

19         MR. NEITER:   That's okay.   You just wait until

20  he asks you the question.   Then you can answer the

21  question if I don't object.

22         THE WITNESS:   Yes, sir.

23  BY MR. LEVIN:

24      Q.   So has Stanley ever done work out of your

25  office where he wasn't working for you?

ELIOZAR GUTGARTS - 2/24/2011

Page 15

1      A.  Not for me, for office.  He was like driver,

2   paperwork.  I don't remember.  It was long time ago.

3      Q.  This was also 20 or 30 years ago?

4      A.  Yeah.  20 or 30 years ago.

5      Q.  What about in -- strike that.

6          Are you aware that Stanley went to jail for a

7   period of time?

8      A.  Yeah, after jail he work maybe a couple of

9   months.

10     Q.  At your office?

11     A.  Uh-huh.

12     Q.  Yes?

13     A.  Yes.

14     Q.  What did he do for a couple of months at your

15  office after jail?

16     A.  Driver, paperwork, clean office.

17     Q.  When you say driver, what was he doing?

18  Obviously driving, but what was he driving?

19     A.  I working with old and ill, sick patient, and

20  he drive home, bring me patient, sick patient, my

21  patient.

22     Q.  You said old, sick or ill patient?

23     A.  Sick.

24     Q.  And he would drive them to or from your office?

25     A.  Yeah, help.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 16

1    Q.   Help you?

2    A.   Help me with the patients.  I work on the
3    second floor and he help me.  I pay him.  I pay him.

4    Q.   And when you paid him, did you pay him cash or
5    check?

6    A.   Check.

7    Q.   And the checks that you paid him with, were
8    they written from your personal account or your business
9    account?

10   A.   Business.

11   Q.   And the business account is in what name?

12   A.   My business account?

13   Q.   Yes.

14   A.   Dr. Gutgarts Dental Center.

15   Q.   Dr. Gutgarts Dental Center?

16   A.   Yeah.

17   Q.   Is that a corporation?

18   A.   Now it's corporation, yeah.

19   Q.   Now it's a corporation?

20   A.   Uh-huh.

21   Q.   Yes?

22   A.   Yes.

23   Q.   Was it a corporation when you paid him?

24   A.   No, well, it was before, before corporation, it
25   was a regular dental office and that's it.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 17

1    Q.  I think they call it in California a
2    professional service corporation?  Is that what it is?
3    A.  Professional corporation.
4    Q.  And that existed before this period of time
5    that you were paying him after he got out of jail.
6    A.  I don't remember.  It was 10 or 12 or 15 years
7    ago.
8    Q.  That he got out of jail?
9    A.  I don't remember.  I don't remember before or
10   after.
11   Q.  Okay.  So the checks that you used to pay him
12   came from this corporation bank account; correct?
13   A.  It was not corporation.  It was dental office.
14   After we open corporation.  Maybe ten years ago or seven
15   years ago.
16   Q.  When you wrote him checks after he had gotten
17   out of jail, you said that they were written on the
18   account of Dr. Gutgarts Dental Center; correct?
19   A.  Correct.
20   Q.  Where was that account held?
21   A.  Account what?
22   Q.  The account that you paid him out of, where was
23   it?
24   MR. NEITER:  Excuse me.  I'm going to object
25   because I don't understand the question.  Do you mean

ELIOZAR GUTGARTS - 2/24/2011

Page 18

1    the name of the bank that the account was there or the
2    address?  I don't understand your question.
3            MR. LEVIN:  We can start with the name of the
4    bank, but I'm looking for who held the account.  That's
5    usually the bank; right?  Or no?
6            MR. NEITER:  I'm not familiar with the phrase
7    who held the account.  But if you are asking him about
8    his office's bank account -- bank identity and the
9    location, I will object on the grounds of his right of
10   privacy and instruct him not to answer the question.  If
11   you're asking him --
12           MR. LEVIN:  So with respect to an account that
13   he used to pay the judgment debtor in the case money
14   with a check, I'm not entitled to know where that money
15   came from.
16           MR. NEITER:  Ten to 15 years ago, that is
17   correct.  I don't know if you're entitled.  I'm not
18   saying you're not entitled.  I'm saying you're not
19   entitled to get that information from Dr. Gutgarts.
20           MR. LEVIN:  What was 10 or 15 years ago?
21           MR. NEITER:  That was when he testified, I
22   believe, Stanley Stein worked for him.
23           MR. LEVIN:  No, he testified that Stanley Stein
24   worked for him after he got out of jail, but didn't
25   remember when he got out of jail.

ELIOZAR GUTGARTS - 2/24/2011

Page 19

1          MR. NEITER:  My objection stands.  My
2     instructions stand.
3     BY MR. LEVIN:
4          Q.  So you're refusing to tell me where it is that
5     that bank account was held on the advice of your
6     counsel?
7          A.  One more time, please.
8          Q.  I asked the question as to where the bank
9     account was held that you drew the funds from to pay
10    Stanley Stein.  Your attorney objected and instructed
11    you not to answer.
12          Are you following your attorney's advice?
13          A.  I'm following.
14          MR. NEITER:  As a matter of fact, to shortcut
15    this a little bit, I'm prepared to enter into a
16    stipulation that when I instruct my client not to
17    answer, he or she will not answer on the basis of that
18    instruction.
19          MR. LEVIN:  You can't stipulate to that.  Your
20    client would have to stipulate to that.
21          MR. NEITER:  No.  I proffered the stipulation.
22    You can accept it or not.  We don't have to determine at
23    this sitting whether I am -- it's within my province to
24    stipulate for my client to something like that or not.
25          MR. LEVIN:  Without having done the research on

ELIOZAR GUTGARTS - 2/24/2011

Page 20

1    that issue, with all due respect, I'll just ask him that

2    second question each time.  It doesn't take that much

3    time.  You might be absolutely right, but it's just

4    unusual for me and I'm from Chicago.  We do things very

5    differently in Chicago.

6            MR. NEITER:  I only know about the voting in

7    Chicago.

8            MR. LEVIN:  We got a new mayor.  That's all

9    that matters.

10        Q.  So Stanley drove patients, ill and sick

11   patients back and forth to your office and helped them

12   up stairs.  You said you live (sic) on the second floor.

13   I think you also said he did paperwork in the office.

14   What kind of paperwork did he do?

15        A.  Paperwork?  Put one chart from this table to

16   this table, from front desk to operatory.  That's it.

17        Q.  So like filing work.

18        A.  It's not filing work.  It's help like -- it's

19   not filing work.

20            MR. NEITER:  You've answered the question.  Let

21   him ask you another question.

22            THE WITNESS:  Okay.

23   BY MR. LEVIN:

24        Q.  What else did he do for you?

25        A.  Hum?

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

1      Q.  What else did he do for you after he had gotten

2  out of jail?

3      A.  I don't know.  I don't know.  He didn't do for

4  me nothing.

5      Q.  Other than the driving and the paperwork?

6      A.  It was maybe couple of months.  Maybe less.

7      Q.  How much did you pay him?

8      A.  Maybe 30,000 a month, 50,000 a month.  What are

9  you asking?  I remember how much I pay?  8.50 per hour.

10     Q.  I'm sorry, we went from 30,000 a month to 8.50

11  per hour?

12          MR. NEITER:  I think he was joking with you.

13  Dr. Gutgarts, I'm going to tell you do not joke because

14  whatever it is that comes out of your mouth goes in

15  front of the court reporter.  He asked you how much you

16  paid Mr. Stein.

17          THE WITNESS:  Minimum.  Minimum.  Minimum --

18  BY MR. LEVIN:

19     Q.  Wage?  Minimum wage?

20     A.  Minimum wage, yeah.

21     Q.  And this was for two months?

22     A.  Maybe two months, three months.

23     Q.  Has he done any other work for you since?  Has

24  he done any other work for you since --

25     A.  No.

Merrill   Corporation   -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 22

1      Q.   -- that two- or three-month period?

2      A.   No, nothing.

3      Q.   When was the last time after Marina left the

4  hospital that you saw Marina?

5      A.   I saw Marina.

6      Q.   You saw her at the hospital and then after the

7  hospital when she went home after the surgery --

8      A.   Yeah, after the hospital I saw Marina.

9      Q.   When was the last time?

10     A.   Maybe couple of weeks ago.

11     Q.   Where did you see her?

12     A.   In my office.

13     Q.   What was she doing in your office?

14     A.   Cleaning teeth.  I don't remember.  Or say hi.

15     Q.   Does she often come -- does she come to your

16  office to say hi?

17          MR. NEITER:  Just a moment.  I'm going to

18  object on the grounds of relevance to that question.  It

19  does not relate to any issue.

20  BY MR. LEVIN:

21     Q.   Is it unusual for her to come to your office to

22  say hi?

23          MR. NEITER:  Same objection.  You may answer

24  the question if it's unusual if you understand it.

25          THE WITNESS:  Very usual.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 23

BY MR. LEVIN:

        Q.   How often does she come to your office to say
hi?

                MR. NEITER:  Objection; irrelevant.

                THE WITNESS:   I never counted how many times.
BY MR. LEVIN:

        Q.   Is it every day?

        A.   A year, a month, maybe couple of times, couple
of times a month, once a month.

        Q.   When she last came, you said she came to get
her teeth cleaned?

        A.   I think, yes.

        Q.   And did she come alone?

        A.   Alone.

        Q.   When was the last time you cleaned Stanley's
teeth?

        A.   I'm going to have to check my file.

        Q.   Was that your answer?

        A.   Yeah, I'm gonna check my file and tell you
exactly when, my dental file.

        Q.   So you keep a file on Stanley.

        A.   Yeah, of course, like for every one of my
patients.

        Q.   Do you charge Stanley for the services?

                MR. NEITER:  Just a minute.  Objection;

f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 24

1    irrelevant.  You may answer the question.

2    BY MR. LEVIN:

3        Q.  Do you charge Stanley for the services?

4        A.  Charge money?

5        Q.  Yes.

6        A.  Never, because this is my relative.  I never

7    charge for --

8            MR. NEITER:  That's enough.  You've answered

9    the question.

10   BY MR. LEVIN:

11       Q.  Does Stanley have insurance?

12       A.  Huh-uh.

13       Q.  No?

14       A.  No.

15           MR. LEVIN:  I'll hand you what we're going to

16   mark as Exhibit 1.

17           (The document referred to was marked as

18           Exhibit 1 for identification and is

19           attached hereto.)

20   BY MR. LEVIN:

21       Q.  I'll ask you to review that document.  I'll

22   give you time to do so.

23       A.  What is it?

24           MR. NEITER:  It's the same one.  Just look at

25   this one, though.

Merrill   Corporation   -   Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 25

1          THE WITNESS:  I see it.

2   BY MR. LEVIN:

3          Q.   You recognize this document?

4          A.   Yeah.

5          Q.   This was a document that was served upon you in

6   this case?  Someone brought this document to your office

7   and gave it to you?

8          A.   Yeah.  Sure.

9          Q.   And this is the subpoena to testify at a

10  deposition in civil case in the current matter.  And I'm

11  going to refer your attention to the very last page.

12  There's a list of documents that you were asked to

13  produce at today's deposition.

14          Did you bring any documents with you today that

15  you're going to produce?

16          A.   I didn't bring any documents because I don't

17  have any documents.

18          Q.   Okay.  So let's just briefly review the list

19  and confirm that you don't have documents responsive to

20  these requests.

21          You don't have any documents relating to

22  Stanley Stein.

23          A.   No.

24          MR. NEITER:  Excuse me.  I have interposed an

25  objection to Number 1 under the physician-patient

Merrill  Corporation  -  Los Angeles
800-826-0277                         www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 26

1    privilege, and, of course, HIPAA, the federal law, does
2    not allow him to bring his dental records.
3    BY MR. LEVIN:
4        Q.  Okay.  So we've verified already that you have
5    dental records.  They're just not being produced per the
6    instructions of your attorney; correct?
7        A.  Correct.
8        Q.  And do you have any other documents in your
9    possession that relate to Stanley Stein other than
10    dental records?
11        A.  No.
12        Q.  You paid Stanley Stein money; correct?
13        A.  Correct.
14        Q.  So you would have the checks or the bank
15    statements that would reflect payments that you made to
16    Stanley Stein; correct?
17        A.  Yeah, but it was very long time ago.
18        Q.  It was after he got out of jail.
19        A.  I don't remember.
20        Q.  Well, that's what you said earlier so I'm just
21    verifying that's what you said.
22        A.  I don't remember.
23        Q.  Now you're not sure it's when he got out of
24    jail?
25        MR. NEITER:  After he said, not when.

ELIOZAR GUTGARTS - 2/24/2011

Page 27

1           THE WITNESS:  I don't remember what years,

2     10 years.

3     BY MR. LEVIN:

4           Q.  Did you bother looking to see whether or not

5     you had any checks or bank statements that reflect

6     payments that were made to Stanley Stein?

7           A.  Never.

8           Q.  You never looked?

9           A.  No.

10          MR. NEITER:  I will point out --

11          MR. LEVIN:  Are you testifying or objecting?

12          MR. NEITER:  I'm pointing out that we had given

13    to you in Dr. Lyudmila Gutgarts's deposition in 2002, I

14    think it was, or I submitted them to you, copies of

15    checks, and I think they were bank statements, relating

16    to the period when the dental office paid Mr. Stein.

17    Those were transmitted to you.  I have my copy of that.

18    So I am sure you're not trying to mischaracterize

19    something here.

20          MR. LEVIN:  All done?

21          MR. NEITER:  Yes.

22    BY MR. LEVIN:

23          Q.  Okay.  So you didn't bother looking for any of

24    the records that you might have related to Stanley Stein

25    because why?

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 28

1      A.   No.

2      Q.   Why didn't you bother looking?

3      A.   What?

4      Q.   Why didn't you look for the documents that we

5 asked you to bring?

6      A.   Documents what?  This documents?

7      Q.   Related to Stanley Stein.

8      A.   I don't have any documents for Stanley Stein.

9      Q.   You said you would have had checks and bank

10 statements relative to payments that you made to him;

11 correct?

12           MR. NEITER:  No, he did not testify to that.

13           MR. LEVIN:  That's actually what he said.

14           MR. NEITER:  Whatever he said is in the record.

15 BY MR. LEVIN:

16      Q.   So you can correct me if that's not your

17 testimony.  You said that you had paid him with checks;

18 correct?

19      A.   Correct.

20           MR. NEITER:  I'm not going --

21           MR. LEVIN:  Jerry, do you have an objection?

22           MR. NEITER:  I object to your repeating the

23 question and asking him if that was his answer.  His

24 answer is contained in the reporter's notes.

25           MR. LEVIN:  That's not an objection.  Limit

Merrill   Corporation   -  Los Angeles
800-826-0277                 www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 29

1    your outbursts to objections only because that's all

2    you're allowed to do in a deposition.  Okay?  Are we

3    agreed?

4             MR. NEITER:  Objection; asked and answered.

5             MR. LEVIN:  Not an appropriate objection

6    especially when English is his third language and we're

7    trying to clarify it.  If he feels that my question to

8    him is an improper characterization of something he said

9    earlier, he can say so.

10            MR. NEITER:  I'm sorry, was that a question or

11   were you instructing me how to conduct myself in a

12   deposition?

13            MR. LEVIN:  I'm instructing you not to

14   interfere with the deposition any further because you're

15   limited to only voicing objections.

16       Q.  You said that you paid Stanley Stein with a

17   check; correct?

18            MR. NEITER:  Objection; asked and answered.

19   BY MR. LEVIN:

20       Q.  Okay, answer the question.  You paid Stanley

21   Stein with a check?

22       A.  I paid Stanley Stein check.

23       Q.  Did you go and look when you got this subpoena

24   that's sitting before you as Exhibit 1 to find any of

25   the checks that you paid him with?

Merrill  Corporation  -  Los Angeles
800-826-0277                                www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 30

1    A.  It was more than 10 years ago.  I didn't keep
2    it, documents.
3    Q.  So you're saying you don't have any of the
4    documents?
5    A.  Absolutely.  I don't have any documents related
6    Stanley Stein, Marina Stein, Yuri Stein.  I don't have
7    any documents.
8    Q.  Well, you have their medical records?
9         MR. NEITER:  Excuse me.
10        THE WITNESS:  Yeah, you asked me --
11        MR. NEITER:  No, no, no.  Just a moment.
12   Objection; argumentative.
13   BY MR. LEVIN:
14   Q.  Okay.  You have their dental records; correct?
15        MR. NEITER:  Whose dental records?
16        THE WITNESS:  Yeah, I have --
17        MR. NEITER:  No, objection -- just a moment.
18   Just a moment.  Objection; unintelligible.  I don't know
19   who you mean by their records now.
20        MR. LEVIN:  Your objection is unintelligible.
21        MR. NEITER:  Your question is unintelligible.
22        MR. LEVIN:  Okay.  Did you hear me?
23        MR. NEITER:  I thought I did.
24        MR. LEVIN:  So it was intelligible.
25        MR. NEITER:  No.  It was audible.  It was not

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 31

1   intelligible.

2   BY MR. LEVIN:

3       Q.  Do you have medical records for Stanley Stein

4   or dental records?

5       MR. NEITER:  Objection; asked and answered.

6   BY MR. LEVIN:

7       Q.  Do you have dental records --

8       MR. NEITER:  That one I will instruct him not

9   to answer again because that question now has bordered

10  on the harassment.

11      MR. LEVIN:  You haven't even let him answer the

12  question.  How is it asked and answered?  He's only

13  answered it once, and I'm trying to get a clarification

14  because he's changed his answer, so why don't you just

15  let me ask the question instead of wasting all our time

16  with an asked-and-answered objection which is improper.

17  This is a discovery deposition.  This is not trial.

18  Relevance is even an inappropriate objection in a

19  discovery deposition.

20      MR. NEITER:  Perhaps not in Chicago, but in the

21  federal courts that I have practiced in, it is indeed an

22  objection.

23      MR. LEVIN:  Okay.

24      MR. NEITER:  It will give you the opportunity

25  and the reason why it's objectionable is because it

Merrill   Corporation   -   Los Angeles
800-826-0277                         www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 32

1   gives the questioner an opportunity to rethink the

2   question and to rephrase the question.

3       MR. LEVIN:  This is going to take a really long

4   time.

5       MR. NEITER:  I don't think so.

6       MR. LEVIN:  It will because I could have had

7   five questions asked already.

8       Q.  Do you have medical records for Yuri Stein?

9       MR. NEITER:  Objection; irrelevant.

10  BY MR. LEVIN:

11      Q.  Answer the question.

12      MR. NEITER:  Do not answer the question.  It is

13  both irrelevant and interferes with Yuri Stein's privacy

14  rights.

15      MR. LEVIN:  Do you represent Yuri Stein?

16      MR. NEITER:  I do indeed as you would notice if

17  you would have read my objections to Yuri Stein's

18  deposition.

19      MR. LEVIN:  I found it surprising so I want to

20  confirm.

21      Q.  Do you have medical records or dental records

22  for Marina Stein?

23      MR. NEITER:  Excuse me.  Objection on the

24  grounds of privacy, Marina Stein's privacy rights.

25      THE WITNESS:  This is OSHA.  I can't say.

ELIOZAR GUTGARTS - 2/24/2011

Page 33

1          MR. NEITER:  Pardon me?

2          THE WITNESS:  This is OSHA.  This is the rules.

3   I can't say.

4          MR. NEITER:  HIPAA, not OSHA.

5          THE WITNESS:  HIPAA, not OSHA.  HIPAA, I'm

6   sorry.

7          MR. NEITER:  I understand.  Let's not you and I

8   talk.  We want the reporter to move forward with the

9   deposition.

10          MR. LEVIN:  So you're instructing him not to

11  answer any of those questions.

12          MR. NEITER:  I do indeed.

13  BY MR. LEVIN:

14     Q.  Are you following your counsel's advice and not

15  answering the question whether or not you have Marina or

16  Yuri Stein's dental records?

17          MR. NEITER:  Excuse me.  Answer the question.

18          THE WITNESS:  Yeah, I listened.  Can I say yes?

19          MR. NEITER:  The question is are you following

20  my instructions?

21          THE WITNESS:  I follow.

22  BY MR. LEVIN:

23     Q.  Okay.  Other than the dental records for

24  Stanley Stein, your testimony is that you have no other

25  documents in your possession or control relative to

Merrill   Corporation   -   Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 34

1    Stanley Stein; is that correct?

2        A.   I don't understand.

3        Q.   Other than the dental records for

4    Stanley Stein, you're saying that you don't have any

5    other documents related to Stanley Stein; correct?

6        A.   Correct.

7        Q.   But you're also saying you did not look for any

8    documents because you thought that they were too old to

9    look for; is that correct?

10       A.   Correct.

11       Q.   Other than the money that you paid to

12   Stanley Stein for the periods of time that he was

13   working for you, did you ever give him any other money?

14       A.   No.

15       Q.   And would that include from you personally?

16       A.   Never.

17       Q.   Do you know whether or not your wife has ever

18   given him any money?

19       MR. NEITER:   Just a moment.   Objection;

20   husband-wife privilege, irrelevant.   I instruct him not

21   to answer the question.

22   BY MR. LEVIN:

23       Q.   Are you following your attorney's advice and

24   not answering the question?

25       A.   I follow.

ELIOZAR GUTGARTS - 2/24/2011

Page 35

1      Q.   Are you familiar with an entity by the name of

2   Field Chasers?

3      A.   I never hear this name.

4      Q.   And what about Midas of Glendale, are you

5   familiar with that business?

6           MR. NEITER:   Those are two questions.   If you

7   understand the question, you may answer it.

8           THE WITNESS:   Yes, I know.

9   BY MR. LEVIN:

10     Q.   What is it?

11     A.   This is tires and muffler shop.

12     Q.   And do you know who owns that shop?

13     A.   Yeah.

14     Q.   Who?

15     A.   Marina Stein.

16     Q.   And how is it that you know that she owns it?

17     A.   She tell me.

18     Q.   And who works there?

19     A.   Mechanical shop who work.

20     Q.   I'm sorry?

21     A.   It's a mechanical shop.   Mechanical work.

22     Q.   Do you know the people who work there?

23     A.   No.

24     Q.   You don't know any of the people who work

25   there?

ELIOZAR GUTGARTS - 2/24/2011

Page 36

1      A.   No.   I know it's Glendale.   Like from here to
2   Chicago.
3      Q.   I'm sorry?
4      A.   Like from here to Chicago.
5      Q.   Probably feels that way when you're driving
6   there.
7           Other than the checks and the bank account that
8   we discussed earlier relative to the payments that you
9   made to Stanley Stein, do you now have any information
10   concerning any of Stanley Stein's bank accounts?
11      A.   No.
12      Q.   Do you have any information concerning
13   Stanley Stein's current occupation --
14      A.   No.
15      Q.   -- what he does for a living?
16      A.   No.
17      Q.   Do you have any information concerning where he
18   lives?
19      A.   No.
20      Q.   You don't know what address he lives at
21   currently?
22      A.   No.
23      Q.   The medical records that you have, would they
24   contain his residence address?
25      A.   I think no because somebody write, some not.

Merrill   Corporation   -   Los Angeles
800-826-0277                        www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 37

1    Q.  I'm sorry?

2         MR. NEITER:  He said, "I don't know because

3    somebody write."

4         THE WITNESS:  Somebody write, somebody not.

5    Ladies never write age.  Some people never write

6    address.

7    BY MR. LEVIN:

8    Q.  So you believe that the dental records

9    concerning Stanley Stein don't contain a residence

10   address on them.

11   A.  I don't remember.  I think no.

12   Q.  But you're not sure?

13   A.  I'm not sure, but I'm -- I'm not sure.

14   Q.  Do you have any obligations to maintain

15   patients' residence addresses?

16        MR. NEITER:  I'm going to object because it's

17   an unintelligible question.  It calls for perhaps a

18   legal conclusion at one type of interpretation of that.

19   You may answer the question, however, if you understand

20   it.  Do you want the reporter to read it back?

21   BY MR. LEVIN:

22   Q.  Do you remember the question?

23   A.  No.

24   Q.  Do you have any obligation to maintain your

25   patients' residence addresses?

Merrill   Corporation   -   Los Angeles
800-826-0277                      www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 38

1    A.   No, I never.

2    Q.   You never have what?

3    A.   Problems with residents because patient pay

4  half and half when they start and when they finish.   I

5  don't care about address, about Social Security.

6    Q.   As a dentist, there are certain rules and

7  regulations from the state that govern your conduct; is

8  that correct?

9         MR. NEITER:   Objection; irrelevant, calls for a

10  legal conclusion.   You may answer the question.

11  BY MR. LEVIN:

12    Q.   Is that correct?

13    A.   Correct.

14    Q.   Are you familiar with any of those rules and

15  regulations?

16    A.   I'm familiar.

17    Q.   And then there's also laws such as HIPAA that

18  govern your conduct; is that correct?

19    A.   Yeah, I know there is HIPAA, but I can't tell

20  people put your age or address.   This is up to you, up

21  to you.

22    Q.   So you don't know whether or not you have an

23  obligation to maintain their residence address?

24    A.   Huh-uh.

25    Q.   You're not aware of that?

ELIOZAR GUTGARTS - 2/24/2011

Page 39

1    A.   Huh-uh.

2         THE REPORTER:  Is that "no"?

3         THE WITNESS:  No.

4    BY MR. LEVIN:

5    Q.   Have you ever seen Stanley anywhere other than

6    the hospital or your office in the last five years?

7    A.   Hospital and what?

8    Q.   Your office.

9    A.   One more time.

10   Q.   Have you ever seen Stanley other than at the

11   hospital when Marina was having her surgery or your

12   office when he comes by to say hi or when he worked for

13   you?

14   A.   Of course I see him.

15   Q.   Where do you see him?

16   A.   In my office.  In my home.

17   Q.   He comes to your home?

18   A.   Yeah.

19   Q.   When was the last time he came to your home?

20   A.   Long time ago.

21   Q.   How long?

22   A.   Couple of months for say hello.

23   Q.   He came by your house to say hello?  Yes?

24   A.   For came to my house?

25   Q.   Yes.

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 40

1      A.   For saying hello.

2      Q.   Did he come alone?

3      A.   Alone, sure alone.

4      Q.   Why do you say "sure alone"?

5      A.   Because he was alone.

6      Q.   Does he ever come with anybody else?

7      A.   Never.

8      Q.   Never?

9      A.   Never.

10     Q.   He never came with Marina?

11     A.   No.

12     Q.   When he comes to your house, have you ever seen

13  how he gets to your house?

14     A.   How?

15     Q.   How does he come to your house?  Does he walk?

16     A.   Walk?

17     Q.   Yeah.

18     A.   Maybe drive, maybe walk.

19     Q.   You don't know.  Is that a "no"?

20     A.   I don't know.

21     Q.   And other than the visits that he has at your

22  house and your office, do you see him anywhere else?

23     A.   I explain.  This is his sister.  This is

24  family.  That's it.

25     Q.   Pointing to your wife.

Merrill   Corporation   -   Los Angeles
800-826-0277                      www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 41

1    A.   Yeah.   Yeah.   She's his sister, Stanley, and he
2    like her, and he come to office or home.   That's it.
3    Q.   Other than at the hospital, do you ever see
4    Stanley with Marina?
5    A.   Never.
6    Q.   Ever?
7    A.   Never.
8    Q.   Okay.   And the visits at your house and at your
9    office and at the hospital.   We've covered those.
10   Have you seen him anywhere else?
11   A.   Any what?
12   Q.   Anywhere else other than your house, the
13   hospital, or your office.
14   A.   In hospital, I think.
15   Q.   We covered that.   Anywhere else?
16   A.   For last many years I see him every day only in
17   the hospital and once in months, two months, three
18   months or in my house or in my office, and that's it.
19   Q.   Nowhere else.   No?
20   A.   No.
21   Q.   Have you ever had any knowledge at all in the
22   last five years about what Stanley -- sorry.   We covered
23   that.   Strike that.
24   Do you have any knowledge about Stanley's
25   assets, things he might have in his possession other

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 42

1   than the clothes he's wearing when he shows up at your
2   office, house or at the hospital?
3       A.  Absolutely not.
4       Q.  When he would come to the hospital, would he
5   come alone?
6       A.  Alone.
7       Q.  So you have no knowledge about the financial
8   affairs of Stanley Stein?
9       A.  Absolutely no.
10      Q.  And you've never lent him any money?
11      A.  No.
12      Q.  He's never asked you to borrow any money?
13      A.  No.
14      Q.  Did you ever visit him in jail?
15      A.  Yeah.
16      Q.  How often would you visit him in jail?
17      A.  Maybe twice.
18      Q.  Twice total?
19      A.  Uh-huh.
20      Q.  Yes?
21      A.  Yeah, two times.
22      Q.  Did you go alone?
23      A.  He was alone?
24      Q.  No.  Did you go alone?
25      A.  I was alone for visit?

ELIOZAR GUTGARTS - 2/24/2011

Page 43

1       Q.   Yes.

2       A.   With my wife.

3       Q.   Do you ever talk to Stanley on the phone?

4       A.   I don't know what his phone number.

5       Q.   I didn't ask his phone number.  I asked whether

6    or not you talk to him on the phone.

7       A.   No, I never talk with him.

8       Q.   He doesn't call you to say hi.  He only stops

9    by to say hi?

10      A.   No, for him better come.

11      Q.   Does Marina ever talk about Stanley with you?

12      A.   Never.

13      Q.   Have you ever loaned any money to Marina?  Have

14   you ever loaned any money to Marina?

15      A.   No.

16      Q.   Have you ever paid any money to Marina?

17      A.   Pay money to Marina?  Never.

18      Q.   Did Marina ever work for you?

19      A.   30 years ago.

20      Q.   In the last five years, has Stanley ever told

21   you about any of his travel outside the United States?

22      A.   Travel.

23      Q.   Outside the United States.

24      A.   Yes.

25      Q.   Where did he travel?

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 44

1     A.   To Cancun.

2     Q.   Do you know how long ago that was?

3     A.   Three years ago.

4     Q.   And when did he tell you about it?  Around the

5     time that he traveled?

6     A.   Yes.

7     Q.   And where was he that he told you?  Where was

8     he when he told you about the travel?

9     A.   Told me?

10    Q.   Yes.

11    A.   Come and told.

12    Q.   I'm sorry?

13    A.   He come to my office and tell me about it.

14    Q.   Okay.  Did he tell you who he went with?

15    A.   Don't remember.

16    Q.   Do you recall whether or not he went with

17    anybody at all?

18    A.   What did you say?

19    Q.   Do you recall whether or not he told you that

20    he had gone with someone?

21    A.   With me.

22    Q.   With who?

23    A.   With me.

24    Q.   He went with you?

25    A.   Uh-huh.

ELIOZAR GUTGARTS - 2/24/2011

Page 45

1    Q.  To Cancun?

2    A.  Uh-huh.

3    Q.  You were there with him?

4    A.  Uh-huh, yeah.

5    Q.  It wasn't that he actually told you about the
6    trip; he was on the trip with you.

7    A.  Yeah.

8    Q.  Who else went with the two of you?

9    A.  My wife.

10   Q.  Who else?

11   A.  Marina.

12   Q.  And where did you stay?

13   A.  In hotel.

14   Q.  What hotel?

15   A.  I don't remember the name.

16   Q.  Was it on the beach?

17   A.  On the beach.

18   Q.  In Cancun itself or in one of the towns south?

19   A.  In Cancun.

20   Q.  How long did you stay?

21   A.  One week.

22   Q.  Anybody else go with you?

23   A.  No.

24   Q.  Just the four of you?

25   A.  Yes.

Merrill  Corporation  -  Los Angeles
800-826-0277                      www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 46

1      Q.  Who paid?

2      A.  Paid for what?

3      Q.  Well, let's start with airfare.

4      A.  I don't remember who paid.

5      Q.  Was it you?

6      A.  I don't remember.  Maybe me, maybe my wife.

7      Q.  Who paid for the hotel?

8      A.  This is the same.  It was package.

9      Q.  It was a package?

10     A.  Uh-huh.

11         THE REPORTER:  "Yes"?

12         THE WITNESS:  Yes.

13  BY MR. LEVIN:

14     Q.  Any other travel in the last five years --

15     A.  No, no more.

16     Q.  -- that you're aware of?

17     A.  Only one time.

18     Q.  Only one time that you went with Stanley?

19     A.  Uh-huh.

20     Q.  Yes?

21     A.  Yes.

22     Q.  And did he ever tell you about any other travel

23  that he took?

24     A.  Never.

25     Q.  You're not aware of his travels outside the

ELIOZAR GUTGARTS - 2/24/2011

Page 47

1    United States other than the trip to Cancun with you.

2        A.   Never.

3        Q.   Was there a reason that the four of you were

4    going to Cancun?  Were you celebrating some event?

5        MR. NEITER:  Excuse me just a moment.

6    Objection.  The answer would interfere with my client's

7    privacy rights.  I instruct him not to answer the

8    question.

9        MR. LEVIN:  As to whether or not there was an

10   event that prompted their vacation?

11       MR. NEITER:  Was there a particular thing that

12   you didn't understand that I said or are you trying to

13   argue with me?

14       MR. LEVIN:  I'm trying to get a clarification

15   of your objection.  I just want to make sure what it is

16   you're objecting to and what you're claiming would be a

17   privacy right.

18       MR. NEITER:  I think it was clear.

19       MR. LEVIN:  Okay.

20       Q.   When Stanley comes to your office to visit,

21   does he ever discuss the State Farm case?

22       A.   State Farm case, no, never.

23       Q.   Do you know what the State Farm case is?

24       A.   I have patients with State Farm.

25       Q.   Do you know what this case is about?

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 48

1     A.   Dental.   Dental patients.

2     Q.   Do you know what this case is about?

3     A.   I don't know about this case.

4     Q.   You don't know why it is that you're having

5  this deposition with me?

6     A.   No.

7     Q.   You don't know about the amount of money that

8  Stanley owes to State Farm?

9     A.   No.

10    Q.   You've never been told anything about that?

11    A.   He never said.

12    Q.   I'm sorry?

13    A.   He never tell me and never say me about this.

14    Q.   And you never bothered to find out?

15         MR. NEITER:   Excuse me.   Just a moment.

16  Objection; argumentative, not relevant.

17  BY MR. LEVIN:

18    Q.   So you never bothered to find out?

19         MR. NEITER:   Never bothered to find out what?

20         THE WITNESS:   What?

21         MR. LEVIN:   If you don't know my question, what

22  were you objecting to?

23         MR. NEITER:   On the grounds that it was

24  unintelligible because you hadn't completed.   What was

25  what about?

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS – 2/24/2011

Page 49

1    BY MR. LEVIN:

2        Q.  Are you aware of the fact that Stanley owes

3    State Farm over $14 million?

4        A.  $14 million, no.

5        Q.  And you don't know why he would owe them

6    $14 million?

7        A.  Never.

8        Q.  You're not aware of the fact he was found

9    liable for fraud?

10       A.  No.

11       Q.  Do you know what kind of car Stanley currently

12   drives?

13       A.  Car Stanley drive now?

14       Q.  Yes.

15       A.  Never see his car.

16       Q.  Never seen his car?

17       A.  I know my car.

18       Q.  I don't need to know about your car unless

19   Stanley bought it for you.

20       A.  No, never.

21       Q.  Okay.  He never bought you a car?

22       A.  Never.

23       Q.  When was the last time Stanley bought you

24   anything?  When was the last time Stanley bought you

25   anything?

Merrill  Corporation  –  Los Angeles
800-826-0277                              www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 50

1        A.  I don't know.  What he buy, not buy, I don't
2    know.  We never say about business, about nothing.  We
3    say about kids, my granddaughters, and that's it.
4        Q.  Has he ever given you any gifts?
5        A.  Gifts?
6        Q.  Yes.
7        A.  No.
8        Q.  So he's never given you a birthday present or
9    anniversary present?
10       A.  Never.
11       Q.  But you don't know --
12       A.  Maybe long time ago, but not now.
13       Q.  When you say long time ago, how long?
14       A.  20 years ago.
15       Q.  A lot went on 20 years ago.
16       A.  Because we're together 58 years.
17       Q.  Do you know whether or not Stanley still has
18   relatives outside the United States that he stays in
19   touch with?
20       A.  Relative?
21       Q.  Outside the United States.
22       A.  No.  No, I don't know.
23       Q.  Do you know Ella Brodsky?
24       A.  Who?
25       Q.  Ella Brodsky.

Merrill   Corporation   -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 51

1      A.   Ella Brodsky, no.

2      Q.   Have you ever heard Stanley talk about any

3  businesses that he has outside the United States?

4      A.   Never.

5      Q.   Did you know anything about Stanley's medical

6  marijuana shop?

7      A.   Medical marijuana shop.  No.

8      Q.   Do you know what that is, a medical marijuana

9  shop?

10     A.   No.

11     Q.   Do you know about medical marijuana?

12     A.   I know what is it, medical marijuana, because I

13 working for pharmacies with medical marijuana.  I know

14 what it is, but he never say me about medical marijuana.

15     Q.   When you say you're working with pharmacies on

16 medical marijuana, what does that mean?

17          MR. NEITER:  Objection; interferes with his

18 privacy rights.  Instruct him not to answer.

19 BY MR. LEVIN:

20     Q.   Is it your business that works with the medical

21 marijuana shop?

22     A.   My business --

23          MR. NEITER:  Just a moment.  Same objection;

24 same instruction.

25

ELIOZAR GUTGARTS - 2/24/2011

Page 52

1          MR. LEVIN:  So if it's his business that works
2     with a medical marijuana shop, you're going to claim a
3     right to privacy on his business?
4          MR. NEITER:  I just now did.
5          MR. LEVIN:  You represent his business also?
6          THE WITNESS:  Mr. Levin --
7          MR. NEITER:  Don't even answer the question.
8          MR. LEVIN:  Is that true?  Do you represent his
9     business also?
10         MR. NEITER:  It's not my deposition.  I've
11    instructed him not to answer.  Ask another question.
12         MR. LEVIN:  It may not be your deposition, but
13    you certainly have to state an appearance if you're
14    going to represent a person or entity, don't you?  Which
15    you haven't even actually done.
16         MR. NEITER:  Are we done with his questioning?
17    Are we --
18         MR. LEVIN:  I'm trying to get a clarification
19    that you are asserting a privilege on behalf of the
20    entity, his dental practice.  Is that correct?  You're
21    not going to answer that question?
22         MR. NEITER:  I am not going to answer your
23    question.
24         MR. LEVIN:  You're not going to answer the
25    question as to who you're claiming the privilege on

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 53

1  behalf of, just so we're clear.

2         MR. NEITER:  I believe I was clear that I

3  asserted a privilege as to this witness as to the

4  deponent.  I instructed him not to answer.

5         MR. LEVIN:  So the privilege is on his behalf

6  personally.

7         MR. NEITER:  This is Dr. Gutgarts's deposition.

8  This is his privilege.  I've instructed him not to

9  answer.

10        MR. LEVIN:  I asked a question about his dental

11 practice.

12        MR. NEITER:  I don't know how they practice in

13 Chicago, but that is his practice.  I've instructed him

14 not to answer.

15        MR. LEVIN:  Actually, he said it's a

16 corporation.  But you're still asserting a privilege

17 with respect to a question about the corporation's

18 involvement with a pharmacy and medical marijuana.

19        MR. NEITER:  Perhaps you should ask the

20 question and then I will assert the privilege or not.

21        MR. LEVIN:  I thought we had done that already.

22 I did ask the question and you asserted a privilege.

23        MR. NEITER:  Then what are we beating a dead

24 horse for?

25        MR. LEVIN:  Because I want to make sure I know

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 54

1   who it is that you're asserting the privilege on behalf

2   of.

3          MR. NEITER:  I can't go beyond what is on the

4   record already or my suggestion.

5          MR. LEVIN:  I'm sorry?  I didn't hear the last

6   part.

7          MR. NEITER:  Would you read it back to him,

8   please.

9          (The record was read by the

10          reporter as follows:

11          "MR. NEITER:  I can't go beyond what is on

12          the record already or my suggestion.")

13          MR. LEVIN:  What was your suggestion?

14          MR. NEITER:  What was my suggestion?  My

15   suggestion was that you ask a question that is an

16   intelligible question and then we can focus the

17   objection.

18   BY MR. LEVIN:

19          Q.  Is your dental practice doing business with a

20   pharmacy that's involved with medical marijuana?

21          MR. NEITER:  I instruct him not to answer on

22   the grounds of privacy.

23          MR. LEVIN:  And you're asserting that right to

24   privacy on behalf of whom?

25          MR. NEITER:  I'm asserting the right to

Merrill   Corporation   -   Los Angeles
800-826-0277                    www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 55

1   privacy to the question on behalf of the deponent,

2   Dr. Eliozar Gutgarts.

3   BY MR. LEVIN:

4        Q.  So are you aware of whether or not Stanley was

5   ever involved in the medical marijuana business?

6        A.  No.

7        Q.  No, you're not aware?

8        A.  No.

9        MR. LEVIN:  Okay.  That's all I have for this

10  one.

11       MR. NEITER:  Okay.

12       THE WITNESS:  Done?

13       MR. LEVIN:  With you.

14       MR. NEITER:  Okay.  Thank you.  I have no

15  questions.

16       MR. LEVIN:  We're off the record.

17       MR. NEITER:  I propose a stipulation that the

18  deposition -- that the reporter will be relieved of her

19  responsibility under the Code by sending the original

20  transcript to me, that I will have my client -- my

21  client may sign it by means of declaration of penalty of

22  perjury.  I will advise you of any changes.  I will

23  bring it to court or any other proceeding that you may

24  request.

25       MR. LEVIN:  What kind of timing do you need for

Merrill  Corporation  -  Los Angeles
800-826-0277                          www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 56

1    that?  We're going to order it rushed.  We need this

2    turned around pretty quick.

3            MR. NEITER:  Just a minute.

4            (Discussion held off the record.)

5            MR. NEITER:  After Dr. Mila Gutgarts's

6    deposition, you have Yuri.  So we're talking about two

7    more hours or so.  Let's check at the end of Yuri's and

8    then we'll make a blanket stipulation that you will

9    insert at the conclusion of each one of the three.

10           MR. LEVIN:  That works.

11           (The following stipulation was agreed

12           to in the deposition of Yuri Stein:

13           "MR. NEITER:  We'll stipulate to

14           relieve the court reporter of her

15           responsibility.  She can send the

16           original transcript to me.  My clients

17           will have two weeks from the date of my

18           receipt to read them, sign them, make

19           any corrections, and I'll notify you by

20           email within two days thereafter of any

21           changes that are made or the date and fact

22           of signing.  And they can sign the

23           depositions under penalty of perjury.

24           "MR. LEVIN:  And she can send the e-trans

25           to us by Monday.

Merrill  Corporation  -  Los Angeles
800-826-0277                        www.merrillcorp.com/law
f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 57

1      "MR. NEITER:  She's going to do it to

2      you, but I'm talking about what I'm going

3      to do.  That's the basic stipulation that

4      we would ordinarily make.  I'm not asking --

5      "MR. LEVIN:  So stipulated.

6      "MR. NEITER:  Fine.")

7      (Deposition concluded at 3:11 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

Page 58

DECLARATION

1

2

3

4

5       I hereby declare I am the deponent in the within

6   matter; that I have read the foregoing deposition and

7   know the contents thereof, and I declare that the same

8   is true of my knowledge except as to the matters which

9   are therein stated upon my information or belief, and as

10  to those matters, I believe it to be true.

11      I declare under the penalties of perjury of the

12  State of California that the foregoing is true and

13  correct.

14      Executed on the _____ day of _____

15  2011, at _____, California.

16

17

18

19

20

    _____

21              W I T N E S S

22

23

24

25

f1435324-5c32-4b4a-adac-1ebe9c5e5f24

ELIOZAR GUTGARTS - 2/24/2011

```
 1    STATE OF CALIFORNIA    )
                             ) ss.
 2    COUNTY OF LOS ANGELES  )

 3

 4

 5            I, Marla Gorlick, Certified Shorthand Reporter,

 6    Certificate No. 3767, for the State of California,

 7    hereby certify:

 8            I am the deposition officer that

 9    stenographically recorded the testimony in the foregoing

10    deposition;

11            Prior to being examined, the deponent was first

12    duly sworn by me;

13            The foregoing transcript is a true record of

14    the testimony given;

15            Before completion of the deposition, review of

16    the transcript [ ✓ ] was [   ] was not requested.  If

17    requested, any changes made by the deponent (and

18    provided to the reporter) during the period allowed are

19    appended hereto.

20

21    Dated February 26, 2011.

22

23

24    _____
              MARLA GORLICK
25            CSR No. 3767
```